WILBURN MURCHISON *v.* STATE OF ARKANSAS

5520                              462 S. W. 2d 853

Opinion delivered January 25, 1971
[Rehearing denied March 1, 1971.]

*Sexton, Wiggins & Christian,* for appellant.

*Joe Purcell,* Attorney General; *Milton Lueken,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Wilburn Murchison ap-

peals from his conviction of second degree murder. His three points for reversal are:

I. The prosecuting attorney denied to the defendant a fair trial by suppressing the fact that Detective Earl Sharp would testify contrary to testimony offered by Detective Floyd Atwell.

II. The prosecutor wrongfully denied to the defendant a fair trial by misquoting statements claimed to have been made by witnesses out of court.

III. The evidence is not sufficient to support the verdict.

We shall take up those points in the order listed:

I.

Detective Floyd Atwell of the Fort Smith Police Department testified that after appellant was arrested on a charge of having murdered one Randall Williams, he made an oral statement to the detective. This statement was that he (Murchison) might have been involved in a fight, and might have stabbed somebody, but that he didn't kill anyone. Thereafter, the following proceedings ensued:

BY MR. SEXTON:

Q. Detective Atwell, did you testify in this courtroom in a preliminary proceeding attendant to the charge against Mr. Murchison?

A. In a motion, yes, Sir.

Q. On that occasion were you asked about what Mr. Murchison had said?

A. Yes, Sir.

Q. And on that occasion was your answer that

he said, "Put anything before me you want to, I'll sign it as long as I don't get more than sixty years, because you've already beat my brains out anyway?"

A. Something similar to that.

\* \* \*

Q. Would you tell me as near as you can what you recall that he said?

A. Yes, Sir.

Q. Tell me as near as you can recall what you testified that he said.

A. In regards to giving a statement with reference to the incident, Mr. Murchison stated to type up anything that we desired and that he would sign it as long as it didn't carry over sixty years.

Q. Did he say why he would?

A. No, Sir.

Q. Did you tell the Court in the prior proceeding that he said you had already beaten his brains out anyway?

A. Yes, Sir, he did.

Q. He made that accusation at that time, did he not?

A. Yes, Sir, he did.

Q. As a matter of fact, you had had him by the hair of the head down at the Detective Office, banging him around, hadn't you?

A. No, Sir.

Q. Who was in the room?

A. Mr. Murchison, Earl Sharp and myself.

Q. Was Mr. Sharp always in the room with you and Mr. Murchison?

A. To the best of my knowledge, yes, Sir.

Q. Was there a time when you and Mr. Murchison were in the room by yourselves?

A. Not to my knowledge, no, Sir.

Q. Are you saying that there may have been and you don't recall it?

A. Not to my knowledge.

Q. Who else was present when Mr. Murchison made this oral statement?

A. Myself, Mr. Murchison, Earl Sharp.

Q. Earl Sharp was there?

A. Yes, Sir.

MR. SEXTON: Mr. Prosecutor, may I inquire if you are going to call Detective Sharp?

MR. THOMPSON: We hadn't anticipated calling him.

MR. SEXTON: Do you have him under subpoena?

MR. THOMPSON: He's under subpoena, you may call him if you want to.

\* \* \*

Q. I want to ask you again, Detective Atwell,

was there ever a time when you and Mr. Murchison were alone in the basement of the Police Station?

A. Not to my knowledge.

Q. Not to your knowledge?

A. No, Sir.

This issue was raised by appellant's motion for new trial, wherein it was alleged that the prosecuting attorney wrongfully suppressed information in his possession that Detective Earl Sharp had denied that appellant had made any admission as to stabbing any person.

The record reveals that the trial occupied the better part of two days. Detective Atwell testified on the morning of the second day. A morning recess was called by the circuit judge immediately after Atwell left the stand, which was only a very few minutes after appellant's attorney's inquiry about Detective Sharp. The state rested its case as soon as Atwell left the witness stand. Appellant then called two witnesses whose testimony was completed before the noon recess was called at 11:35 a.m. The defendant and one other witness testified after the noon recess, after which the jury was instructed, the arguments of counsel made and the jury verdict returned after deliberation.

At the hearing on the motion for new trial Detective Earl Sharp was called as a witness by appellant and testified substantially as follows:

I was present in the detective bureau on the night Wilburn Murchison was arrested and charged with murder. He did not to my knowledge state in my presence that he might have been involved in a fight and that he might have stabbed somebody, but did not kill anyone. Numerous people were in the room while Murchison was there. Detective Atwell was primarily charged with questioning Murchison. I

was present when Murchison was removed from the detective bureau and taken upstairs to be put in the jail. I was in his presence almost continuously from the time he was brought in until the time he was taken upstairs. I was subpoenaed as a witness to appear at the prosecution of Murchison and was in attendance during the first day of the trial. The next day was my day off and I didn't want to come to court unless I had to. I was told to call the next morning. Around 10:30 the next day I called Charles Karr,[1] who told me that the state had rested its case and was not going to use me, but that I would have to stay available in case the defense called me. Karr then asked me if I had heard Murchison make a statement that he might have stabbed someone but didn't kill anyone. I had never been asked this question prior to this time by anyone. I told Karr that I didn't hear Murchison make this statement. About 7:00 p.m. on that day, after the trial was over, Murchison's attorney asked me if I was in the room with Atwell and Murchison continuously. I told him I was not, but that if I was out of the room it was only for a few minutes to go over to the radio room to get the time and complaint number for my reports, and talk to a witness or something to that effect. I also told him that I had told Karr the same thing. No one in the prosecuting attorney's office knew what my testimony would be in this respect until I talked with Karr after the state had rested its case. While I was in the room with Atwell and Murchison, I was typing statements and completing paper work. It is possible that Murchison could have made a statement that I did not hear, while concentrating on this work or during one of my brief absences from the room. I do not deny that such a statement was made. I do not know whether it was made or not.

It was stipulated that: Karr reported that Sharp had stated that he did not hear the statement attributed to

---

[1] A deputy prosecuting attorney who was not participating in the trial.

Murchison to another deputy prosecuting attorney who was participating in the trial; that numerous officers, witnesses and persons were about while Atwell and Murchison were in the room; that a former chief of police employed as an investigator by appellant's attorney sought to contact Sharp following Atwell's testimony but reported to the attorney in midafternoon that he had been unable to do so.

At this hearing, the prosecuting attorney stated that he told appellant's counsel that Sharp's testimony would be cumulative. In the closing argument appellant's attorney argued to the jury that if Sharp would corroborate Atwell the prosecuting attorney would have had him present. The prosecutor replied that the defense had the same subpoena power as the prosecution and if there was anything anyone would have said favorable to the defendant, he would have had him present. Appellant made no effort to subpoena Sharp, to request a recess or continuance or to request that Detective Sharp be made available. The trial judge found that there was no wilful suppression of evidence by the prosecuting attorney and denied the motion for a new trial.

In many respects there is a rather close analogy between a motion for new trial upon the ground that evidence was suppressed and one upon the ground of newly discovered evidence. In both instances, the primary focus of the inquiry is to determine whether, in light of the circumstances, the defendant has been deprived of a fair trial by the unavailability to him of the particular testimony. See *Jackson* v. *Wainwright*, 390 F. 2d 288 (5th Cir. 1968); *United States* v. *Wilkins*, 326 F. 2d 135 (2nd Cir. 1964); *Kyle* v. *United States*, 297 F. 2d 507 (2nd Cir. 1961); *Brady* v. *Maryland*, 373 U. S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); The Duty of the Prosecutor to Disclose Exculpatory Evidence, 60 Columbia Law Review 858, 863 (1960).

In making such inquiries, on a motion based on newly discovered evidence, critical points considered are the nature of the testimony, the diligence of the

movant in regard to obtaining the testimony and its probable effect on the outcome of the trial. *Whittaker v. State,* 173 Ark. 1172, 294 S. W. 397; *Freeman v. State,* 238 Ark. 804, 385 S. W. 2d 156; *Steel v. State,* 246 Ark. 75, 436 S. W. 2d 800; *Gross v. State,* 242 Ark. 142, 412 S. W. 2d 279. Whenever a litigant alleges that his right to a fair trial is prejudiced by his being deprived of particular testimony, as, for example, in motions for continuance, the party's diligence in the matter, the materiality of the testimony, and its probable effect at the trial are pertinent subjects of inquiry. *Striplin v. State,* 100 Ark. 132, 139 S. W. 1128.

Testimony which tends only to impeach other testimony is not grounds for a new trial for newly discovered evidence. *Freeman v. State,* supra; *Cooper v. State,* 246 Ark. 368, 438 S. W. 2d 681. In *Smith v. Urban,* 245 Ark. 781, 434 S. W. 2d 283, we clearly recognized that the bearing of the suppressed evidence upon the question of guilt or innocence was an important circumstance for consideration. This holding is consistent with our distinction between cases where the newly discovered evidence merely tends to impeach the credibility of a witness (as was the case in *Steel)* and where the newly discovered evidence overthrows the essential evidence upon which the conviction rested (as was the case in *Smith v. Urban).* *Whittaker v. State* supra; *Bussey v. State,* 69 Ark. 545, 64 S. W. 268.

Whenever a motion for new trial is based upon a matter which requires evaluation of the fairness and impartiality of the trial or its ultimate result because of that ground, we have uniformly held that a wide latitude of discretion must be accorded the trial judge and that we will not reverse his action unless there has been an abuse of that discretion resulting in a miscarriage of justice. This has been the case where the basis of the motion was misconduct in the courtroom [*Pixley v. State,* 203 Ark. 42, 155 S. W. 2d 710] or statements of counsel in argument [*Peters v. State,* 248 Ark. 134, 450 S. W. 2d 276; *Holcomb v. State,* 203 Ark. 640, 158 S. W. 2d 471]; denial of change of venue [*Walker v. State,* 241 Ark. 300, 663, 408 S. W. 2d 905,

cert. denied, 386 U. S. 682, 87 S. Ct. 1325, 18 L. Ed. 2d 403, reh. denied, 387 U. S. 926, 87 S. Ct. 2027, 18 L. Ed. 2d 987 (1967)]; denial of a continuance [*Fisher* v. *State,* 241 Ark. 545, 408 S. W. 2d 894, cert. denied, 389 U. S. 821, 88 S. Ct. 43, 19 L. Ed. 2d 73 (1967)]; as well as newly discovered evidence [*Cooper* v. *State,* supra.]

The allowance of this discretion rests upon the superior opportunity of the trial judge to observe the effects of the particular factor to prejudice a defendant's right to a fair trial in the light of the circumstances, viewing the trial as a whole. *Head* v. *State,* 221 Ark. 213, 252 S. W. 2d 617; *Peters* v. *State,* supra; *Birmingham* v. *State,* 192 Ark. 1095, 96 S. W. 2d 773; see also *Striplin* v. *State,* 100 Ark. 132, 139 S. W. 1128; *Freels* v. *State,* 130 Ark. 189, 196 S. W. 913.

This case does not involve failure of the prosecution to make disclosure upon request or the use of perjured testimony, or evidence which tended to implicate another as the offender. It is also unlike *Smith* v. *Urban,* supra, in most respects. Important factors there considered but absent here were the poverty and ignorance of the defendant and his representation by appointed counsel, who had neither facility nor time for investigation, the nature of the evidence suppressed as bearing directly on defendant's guilt, and the relative importance of the testimony of a witness whose credibility would have been directly attacked. There the principal witness for the prosecution, an alleged accomplice of the defendant, had originally given officers a confession exculpating the defendant. As indicated in a review of authorities in *Smith* v. *Urban,* the determination whether a prosecuting attorney in a criminal case must disclose evidence in his possession favorable to the accused depends upon many factors, and a case by case judgment must be made. See also *U. S.* v. *Wilkins,* 326 F. 2d 135 (2nd Cir. 1964) The factors involved here clearly distinguish this case from *Smith* v. *Urban,* supra. Since the variable factors weighing upon the necessity for disclosure by the prosecution must be decided upon a case by case basis, it is appropriate

that the trial court have some latitude of discretion in determining whether a new trial should be granted on the ground of suppression of evidence.

Appellant assumes that Atwell was referring to Murchison's statement about having stabbed someone when he stated, in response to his question on cross-examination, that Sharp was present. A review of that cross-examination set out above casts some doubt upon that assumption. When the question is read in context, it would be reasonable to assume that the examiner, in asking who was present when Murchison "made this oral statement," was inquiring about the remark of Murchison that because of a beating by the officer he would sign any typed statement that didn't carry over 60 years.

Sharp's testimony would not have necessarily conflicted with that of Atwell. Sharp does not deny that Murchison made the statement, as appellant alleged in his motion. Atwell qualified his answers as to Sharp's continuous presence in the room as being limited to his knowledge. Sharp's explanation of temporary absences from the room and his concentration on typing statements and reports in a room full of officers, witnesses and other people shows clearly, not only that Murchison may well have made statements not heard by Sharp but, that Sharp's absences from the room might not have been noticed by Atwell.

We cannot say that appellant was sufficiently diligent in his attempts to ascertain whether such a statement was known to Sharp to be able to claim that he was deprived of material evidence by the state's suppression. He was plainly advised that Sharp was under subpoena and might be called by him. For some reason which appellant has not chosen to disclose, a search for Sharp was abandoned as soon as his attorney's investigator reported that Sharp was taking his day off. No report or request was addressed to the court, the prosecuting attorney or to Sharp's superiors after this information was brought to appellant's attorney's attention during the course of the trial. Appellant's at-

torney contented himself with inquiring of the detective after the adverse result of the jury trial and after having elected to seek to exploit the state's failure to offer Sharp as a witness as indicative of the incredibility of Atwell's testimony. The failure of this obvious tactical decision apparently produced the pursuit of the present strategy. At any rate, the availability of testimony to a defendant through his own investigation or inquiry is a relevant consideration. *U. S.* v. *Wilkins,* 326 F. 2d 135 (2nd Cir. 1964); *People* v. *Rosenberg,* 59 Misc. 2d 1, 297 N. Y. S. 2d 860 (1969), aff'd, 34 A. D. 2d 961, 313 N. Y. S. 2d 651 (1970); *State* v. *Longo,* 132 N. J. L. 515, 41 A. 2d 317 (1945), aff'd, 133 N. J. L. 301, 44 A. 2d 349; *Jordon* v. *Bondy,* 114 F. 2d 599 (D. C. Ct. App. 1940). See also *Boucher* v. *Warden,* 5 Md. App. 51, 245 A. 2d 420 (1968); *United States* v. *Lanza,* 329 F. 2d 422 (2nd Cir. 1964).

We agree with appellant that his rights are not determined on the basis of the prosecuting attorney's good faith or lack of it and that a request for information by a defendant is not indispensable to his assertion that evidence was wrongfully suppressed. We also agree with those courts which have held that the question is one of fundamental fairness depending in large measure upon the facts of the particular case so that a precise rule cannot be laid down. *People* v. *Rosenberg,* supra. Failure of the prosecution to disclose every shred of evidence in its possession which an accused construes as favorable is not necessarily reversible error. *People* v. *Rosenberg,* supra.

In view of the availability of Sharp's testimony to appellant, the questions arising as to want of diligence of defendant and his employed counsel, the failure of Sharp's testimony to actually contradict that of Atwell, the time when the information became known to the prosecuting attorney, and the sufficiency of the evidence to support a conviction without Atwell's testimony· as to the alleged incriminating statement by appellant (as will be presently demonstrated), we cannot say that the failure of the prosecuting attorney to disclose his information about Sharp's failure to hear the incriminat-

ing statement was of such serious consequence that the denial of a new trial for that reason constituted an abuse of the trial court's discretion.

Appellant has premised his argument, in part, upon DR 7-103b of the Code of Professional Responsibility. This section reads:

> A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or the defendant, if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, negate the degree of the offense, or reduce the punishment.

This code has been adopted by this court. Its precepts should be scrupulously regarded by all practitioners. Yet, even if the prosecutor here should be said to have violated this rule, a reversal for that reason alone is not indicated. A new trial should never be granted as a means of discipline of counsel. See *Patton* v. *Minneapolis St. Ry. Co.*, 247 Minn. 368, 77 N. W. 2d 433, 58 A. L. R. 2d 921 (1956). We must rather view all the circumstances and determine whether a violation of such rules has, alone or in conjunction with other factors, so effectively deprived an accused of a fair trial as to violate the requirements of due process of law. We cannot say that this has occurred in this case. Although appellant contends that the prosecutor's argument emphasized the alleged suppression and this magnified its prejudicial effect, we view the statement as only responsive to appellant's argument. This is a circumstance which the trial judge must have considered along with all the others in exercising his discretion.

## II.

Appellant's second point for reversal is based upon the assertion that the prosecutor wrongfully denied appellant a fair trial by misquoting statements claimed to have been made by witnesses out of court. We do not understand the basis for this argument. It is based

874

upon an assertion that the prosecuting attorney on seven occasions misquoted a statement made to the police by Ray Murchison, a brother of appellant, shortly after the incident leading to the charge against appellant.

The statement contained the following:

> Something attracted my attention around to Wilburn and the man that got stabbed was—and I saw the man holding his chest and he staggered back. The man fell down and then he got up and then I looked around for Wilburn and I could not find him.

Appellant quotes the following question by the prosecuting attorney on cross-examination of Ray Murchison as typical of the alleged misquotation, to-wit:

> * * * standing with your back to the bandstand, your back to Wilburn and Randall—that you didn't say that, "Something attracted my attention around to Wilburn and the man had got stabbed and I saw the man holding his chest and he staggered back."

We simply do not understand how it can be said that there was any prejudicial misquotation involved here.

### III.

Appellant also contends that the evidence was not sufficient to support the verdict. This argument is based upon the contentions that there are numerous contradictions in the testimony of the state's witnesses and that the testimony tends to more clearly implicate Ray Murchison than Wilburn Murchison.

The resolution of conflicts and inconsistencies in the testimony was for the jury. *Mondier* v. *State,* 210 Ark. 933, 198 S. W. 2d 177; *Tiner* v. *State,* 109 Ark. 138, 158 S. W. 1087. It was for the trial court on review on motion for new trial to determine whether the jury's

action was contrary to the evidence. *Cameron v. State,* 13 Ark. 712; *Oliver* v. *The State,* 34 Ark. 632. We can only say that there is substantial evidence to support the verdict when it is viewed in the light most favorable to the state, and this is the extent of the scope of our review. *Slinkard* v. *State,* 193 Ark. 765, 103 S. W. 2d 50; *Higgins* v. *State,* 204 Ark. 233, 161 S. W. 2d 400; *Ashcraft* v. *State,* 208 Ark. 1089, 189 S. W. 2d 374; *Wootton* v. *State,* 232 Ark. 300, 337 S. W. 2d 651; *Finley* v. *State,* 233 Ark. 232, 343 S. W. 2d 787; *Ballew* v. *State,* 246 Ark. 1191, 441 S. W. 2d 453.

It would serve no useful purpose to detail all the testimony of all the witnesses. There was evidence tending to show that:

Randall Williams was sitting in a booth near the bandstand in Harold's Club with James Irvin, Shirley Ann Horton and Karen Taylor on the evening he was killed. Appellant, his brother Ray, a brother Roy, appellant's wife, his father and other members of the Murchison family arrived at the night club around 7:00 p.m. A fight took place somewhere inside the club between Williams and Roy Murchison. The fight was broken up by the managers of the place and Williams returned to the booth still occupied by his companions. Wilburn Murchison walked to this booth somewhere between five and thirty minutes after the fight. He was wearing a hat on this evening.[2] Ray Murchison either accompanied or followed appellant to the booth. Wilburn asked Williams either what had happened or if he was the one who had stomped his brother. Ray Murchison was standing behind appellant and either confronted or was talking to James Irvin.[3] Almost immediately thereafter there was a scuffle, and Williams fell toward the band-

---

[2]It was introduced in evidence and identified by Ray Murchison and Gordon Fugitt. Other witnesses could not identify it and still others described it as being of different colors.

[3]Irvin was unable to identify appellant or his hat.

stand. Appellant's wife came and got him, and they and other members of the Murchison family left the club and the premises rather hurriedly. Ray Murchison turned when Wilburn's wife approached and saw that something had happened to Williams. After Williams fell, he was picked up and put on a pool table, where he lay moving and groaning when Officer Curtis Balch arrived at the scene. There was blood on Williams' coat when he was picked up. No one other than appellant ever touched Williams before he fell. Elmo Griffin, an employee of Harold's Club, heard appellant say about 15 minutes after the first fight that he'd kill the s—— of b—— before the night was over if it would do any good. Afterwards Griffin was almost run over by the Murchisons leaving the premises in a car. Griffin next saw appellant about 12:30 in a "joint" in Moffett, Oklahoma, drinking beer. Appellant said "Elmo, you ain't seen me."

W. C. Gilliam, a deputy sheriff of Sequoyah County Oklahoma, who arrested appellant at the Red Tank in Moffett, found an opened knife in his right rear pocket. The officer noticed blood or something red on the blade. He delivered the knife to Atwell.

An autopsy on Williams' body revealed a stab wound in the left chest 1½ centimeters in length and about 3 inches deep with gaping edges about 2 inches below the border of the left nipple, which was the cause of death. The substance on the knife appeared to the physician who performed the autopsy to be blood, but its quantity was insufficient for a conclusive test. The knife found on appellant had a blade 1.6 centimeters wide and 3 inches long plus or minus 1/16 of an inch. A slash in Williams' coat measured 1.5 centimeters in length.

Appellant admitted going to the booth where Williams was seated, but said he merely advised Williams of his intention to see that his brother would not cause Williams further trouble. He claimed to have had the

knife open in his back pocket when arrested because he had been using it in an effort to open a can of beer. He admitted having worn the hat exhibited while at Harold's Club but said that he did not have it on when he went to the Williams booth.

This evidence was perhaps sufficient to have sustained a conviction of first degree murder. It was certainly sufficient to sustain a conviction of second degree murder.

The judgment is affirmed.